**CORRECTED OPINION**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EDUCATIONAL MEDIA COMPANY AT
VIRGINIA TECH, INCORPORATED;
CAVALIER DAILY, INCORPORATED, The
Cavalier Daily, Incorporated,

    *Plaintiffs-Appellees,*

    v.

SUSAN R. SWECKER, Commissioner,
Virginia Alcoholic Beverage Control
Commission; PAMELA O'BERRY
EVANS, Commissioner, Virginia
Alcoholic Beverage Control
Commission; W. CURTIS COLEBURN,
III, Chief Operating Officer Virginia
Department of Alcoholic Beverage
Control; FRANK MONAHAN, Director,
Law Enforcement Bureau of the
Virginia Department of Alcoholic
Beverage Control; ESTHER H.
VASSAR, Commissioner, Virginia
Alcoholic Beverage Control
Commission,

    *Defendants-Appellants.*

THOMAS JEFFERSON CENTER FOR THE
PROTECTION OF FREE EXPRESSION;
STUDENT PRESS LAW CENTER;
COLLEGE NEWSPAPER BUSINESS AND
ADVERTISING MANAGERS,                    No. 08-1798

          *Amici Supporting Appellees.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
M. Hannah Lauck, Magistrate Judge.
(3:06-cv-00396-MHL)

Argued: October 29, 2009

Decided: April 9, 2010

Corrected Opinion Filed: April 19, 2010

Before SHEDD, Circuit Judge,
HAMILTON, Senior Circuit Judge, and
Norman K. MOON, United States District Judge
for the Western District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Shedd
wrote the majority opinion, in which Senior Judge Hamilton
joined. Judge Moon wrote a dissenting opinion.

**COUNSEL**

**ARGUED**: Catherine Crooks Hill, OFFICE OF THE
ATTORNEY GENERAL OF VIRGINIA, Richmond, Vir-

ginia, for Appellants. Rebecca Kim Glenberg, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** William C. Mims, Attorney General, Stephen R. McCullough, Solicitor General of Virginia, Maureen Riley Matsen, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Frank M. Feibelman, Cooperating Attorney, ACLU OF VIRGINIA, Richmond, Virginia, for Appellees. J. Joshua Wheeler, Robert M. O'Neil, THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION, Charlottesville, Virginia, for the Thomas Jefferson Center for the Protection of Free Expression, Amicus Supporting Appellees. Katherine A. Fallow, Carrie F. Apfel, Garrett A. Levin, JENNER & BLOCK, LLP, Washington, D.C.; Frank D. LoMonte, Michael C. Hiestand, STUDENT PRESS LAW CENTER, Arlington, Virginia, for Student Press Law Center and College Newspaper Business and Advertising Managers, Amici Supporting Appellees.

---

**OPINION**

SHEDD, Circuit Judge:

The Commonwealth of Virginia, through its Alcoholic Beverage Control Board ("the Board"), regulates advertisements for alcohol. In this action, Educational Media Company at Virginia Tech (*The Collegiate Times*) and The Cavalier Daily, Inc. (*The Cavalier Daily*) (collectively, "the college newspapers") argue that two of the Board's regulations restricting alcohol advertisements (3 Va. Admin. Code §§ 5-20-40(A) & (B)(3)) violate their First Amendment rights. The district court granted the college newspapers' motion for summary judgment, declared both provisions facially unconstitutional, and permanently enjoined their enforcement. On appeal, the Board challenges only the court's invalidation of

§ 5-20-40(B)(3). For the reasons set forth below, we reverse and remand.

## I.

We review the district court's order granting summary judgment *de novo*, viewing the evidence in the light most favorable to the Board. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004). The Board, a subsidiary of the Department of Virginia Alcoholic Beverage Control, is charged with regulating the importation and distribution of alcohol within the Commonwealth of Virginia. *See* Va. Code Ann. § 4.1-103. To carry out this duty, the Board has the authority to "promulgate reasonable regulations." Va. Code Ann. § 4.1-111(A).

The Board exercises its authority in various ways to fight illegal and abusive drinking on college campuses in the Commonwealth. For example, the Board prohibits various types of advertisements for alcohol in any "college student publication," which it defines as any college or university publication that is: (1) prepared, edited, or published primarily by its students; (2) sanctioned as a curricular or extracurricular activity; and (3) "distributed or intended to be distributed primarily to persons under 21 years of age." 3 Va. Admin. Code § 5-20-40(B)(3). Qualifying publications may not print advertisements for beer, wine, or mixed beverages unless the ads are "in reference to a dining establishment." *Id.* These exempted alcohol advertisements may not refer to brand or price, but they may use five approved words and phrases, including "A.B.C. [alcohol beverage control] on-premises," "beer," "wine," "mixed beverages," "cocktails," or "any combination of these words." *Id.*

In addition to this advertising ban, the Board publishes educational pamphlets on the dangers of underage and binge drinking on college campuses, targeted at both underage students and their parents. Further, the Board enforces its regula-

tions by carefully allocating its limited number of officers to target "big events that are likely to gather college students," J.A. 257, and the Board gives grants to colleges and college communities to supplement these targeted efforts.

*The Collegiate Times* is a student-run newspaper at Virginia Polytechnic Institute and State University, and *The Cavalier Daily* is a student-run newspaper at the University of Virginia. The newspapers rely on advertisement revenue to operate, and because of the ban embodied in § 5-20-40(B)(3), each loses approximately $30,000 a year in advertising revenue.[1]

The college newspapers filed a complaint, alleging that § 5-20-40(B)(3) violates their First Amendment rights. The college newspapers mounted both facial and as-applied challenges to § 5-20-40(B)(3). For relief, the college newspapers sought a declaration that § 5-20-40(B)(3) is unconstitutional and an injunction prohibiting its enforcement. After both sides moved for summary judgment, the district court declared § 5-20-40(B)(3) *facially* unconstitutional as an invalid ban on commercial speech.[2] Subsequently, the court permanently

---

[1]The district court determined that both college newspapers were "college student publications" as defined by § 5-20-40(B)(3). J.A. 73 & 75. However, the parties agree that a majority of the readership of the college newspapers is over the age of twenty-one. J.A. 85. Though this concession appears to preclude the college newspapers from qualifying as "college student publications," in a pre-enforcement challenge, the college newspapers need only demonstrate "'a credible threat of prosecution' under the statute or regulation." *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 386 (4th Cir. 2001) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Here, an Alcoholic Beverage Control Compliance Officer specifically advised *The Collegiate Times* that they *would* violate § 5-20-40(B)(3) if they published a specific alcohol advertisement, J.A. 73, and the Chief Operating Officer and Secretary to the Board of the Department of Alcoholic Beverage Control opined that both college newspapers would qualify as college student publications. J.A. 523. Therefore, regardless of whether § 5-20-40(B)(3) applies to these college newspapers, they have a sufficient credible fear of prosecution under this regulation.

[2]The district court did not reach the college newspapers' alternative arguments that § 5-20-40(B)(3) violates the First Amendment because (1)

enjoined the enforcement of § 5-20-40(B)(3). The Board now appeals.

## II.

The Board argues that the district court erred by determining that § 5-20-40(B)(3) facially violates the First Amendment.[3] Both parties agree that to determine whether a regulatory burden on commercial speech violates the First Amendment, we apply the four-part test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980).

Under *Central Hudson*, we must first consider whether the commercial speech is protected by the First Amendment. If it is, the government must then assert a "substantial" interest to justify its regulation. We must then decide whether the regulation directly advances the government's interest and whether the regulation is not "more extensive than is necessary to serve that interest." *Id.* This test applies to both facial and as-applied challenges. *See*, *e.g.*, *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 339-44 (1986) (facial challenge); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 183-95 (1999) (as-applied chal-

as-applied, it unconstitutionally restricts commercial speech under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980), and (2) on its face and as-applied, it unconstitutionally discriminates against a particular segment of the media under *Pitt News v. Pappert*, 379 F.3d 96, 109 (3rd Cir. 2004). Though the college newspapers reiterate these alternative arguments on appeal, we decline to address them in the first instance.

[3]The Board also argues that the district court erred because it entertained a facial challenge to § 5-20-40(B)(3). Although there is judicial disfavor of facial challenges, there is no proscription on such challenges. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-51 (2008) (discussing the problems with facial challenges without banning their use); *West Virginia Ass'n of Club Owners and Fraternal Serv. Inc. v. Musgrave*, 553 F.3d 292, 300-02 (4th Cir. 2009) (same).

lenge). However, the *type* of challenge to a provision — facial or as-applied — dictates the state's burden of proof.

"[A] facial challenge to an ordinance restricting commercial speech may be resolved as a question of law when the government meets the burden placed on it by *Central Hudson*." *Penn Advertising of Baltimore, Inc. v. Schmoke*, 63 F.3d 1318, 1322-23 (4th Cir. 1995), *vacated on other grounds*, *Penn Advertising of Baltimore, Inc. v. Schmoke*, 518 U.S. 1030 (1996). The government may meet this burden by reference to the challenged regulation and its legislative history. *Id.* at 1323. Therefore, a court considers the facial constitutionality of a regulation without regard to its impact on the plaintiff asserting the facial challenge.[4] *Id.*

### A.

We first consider whether the First Amendment protects the commercial speech in this case. To qualify for First Amendment protection, commercial speech must (1) concern lawful activity and (2) not be misleading. *Central Hudson*, 447 U.S. at 566-68. The Board argues that § 5-20-40(B)(3) only regulates commercial speech concerning unlawful activity because it only applies to student newspapers which are "distributed or intended to be distributed primarily to persons under 21 years of age," § 5-20-40(B)(3), and in Virginia, it is illegal to sell alcohol to anyone under twenty-one. Va. Code Ann. § 4.1-302.

---

[4]The appeal before us is based solely on a facial challenge to § 5-20-40(B)(3). The dissent, like the district court, blurs the distinction between a facial and an as-applied challenge. For example, both the dissent and the district court opinion rely on *Pitt News* which is an as-applied challenge. 379 F.3d at 113 (finding the challenged regulation "unconstitutional as applied"). Tellingly, in a subsequent order, the district court acknowledged that its initial order invalidating § 5-20-40(B)(3) created this confusion. J.A. 105 ("The Court now makes clear that, consistent with the remainder of the opinion, the 'as applied' language should not have appeared.").

We have recognized that advertisements for age-restricted — but otherwise lawful — products concern lawful activity where the audience comprises both underage and of-age members. *See*, *e.g.*, *West Virginia Ass'n of Club Owners and Fraternal Serv. Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) (video lottery ads in retail stores); *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1313 (4th Cir. 1995) (*Anheuser-Busch I*) (alcohol advertisements in public), *vacated on other grounds*, *Anheuser-Busch, Inc. v. Schmoke*, 517 U.S. 1206 (1996). On its face, § 5-20-40(B)(3) does not restrict commercial speech *solely* distributed to underage students; rather, it applies to commercial speech that, though *primarily* intended for underage students, also reaches of-age readers. Therefore, the commercial speech regulated by § 5-20-40(B)(3) concerns lawful activity.

Further, because this is a facial, pre-enforcement challenge, "[w]e assume that the speech is not misleading because . . . [the Board] has not provided evidence that the speech is actually misleading, and there is no evidence that the advertising restrictions were enacted to prevent the dissemination of misleading information." *Musgrave*, 553 F.3d at 302. The district court, therefore, properly found that § 5-20-40(B)(3) restricts commercial speech protected by the First Amendment.

## B.

"Next, we ask whether the asserted governmental interest is substantial." *Central Hudson*, 447 U.S. at 566. The Board contends that it has a substantial interest in combating the serious problem of underage drinking and abusive drinking by college students. The college newspapers do not dispute that this interest is substantial. *See* Appellee's Br. 14. Therefore, like the district court, we find the Board's interest to be substantial.

## C.

We next consider whether the advertising ban "directly and materially" advances the government's substantial interest.

*Musgrave*, 553 F.3d at 303 (internal citation and quotation omitted). To determine whether this prong is satisfied "we focus on the relationship between the State's interests and the advertising ban." *Central Hudson*, 447 U.S. at 569. This relationship, or link, need not be proven by empirical evidence; rather, it may be supported by "history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)). However, the link is insufficient if it is irrational, contrary to specific data, or rooted in speculation or conjecture. *Musgrave*, 553 F.3d at 304.

The Board asserts that history, consensus, and common sense support the link between advertising bans in college newspapers and a decrease in demand for alcohol among college students. The Board cites judicial decisions recognizing this general link and argues that, here, this link is extraordinarily strong because college newspapers, a targeted form of media bearing the name of the college, attract more attention among college students than other forms of mass media. The Board also notes that, given the amount of money alcohol vendors spend on advertisement, it is illogical to think that alcohol ads do not increase demand. The college newspapers counter by arguing that: (1) there is no evidence that alcohol advertising bans in college publications decrease demand among college students and (2) a ban on alcohol advertising in college publications is ineffective because college students see ads for alcohol in various other forms of media.[5] The district court agreed with the college newspapers.

---

[5]The college newspapers also argue that, even if there is a link between advertising bans and demand, § 5-20-40(B)(3)'s exemptions undermine its effectiveness. This argument fails to take into account the actual scope of § 5-20-40(B)(3). Even with its exemptions, it proscribes without exception all alcohol ads for non-restaurants. Therefore, in light of the full scope of § 5-20-40(B)(3), its limited exception for restaurants does not render it futile.

We, however, find the link between § 5-20-40(B)(3) and decreasing demand for alcohol by college students to be amply supported by the record, and the district court erred by finding otherwise. Though the correlation between advertising and demand alone is insufficient to justify advertising bans in every situation, *Musgrave*, 553 F.3d at 304, here it is strengthened because "college student publications" primarily target college students and play an inimitable role on campus. *See* J.A. 259 ("The college publication is where [college students are] looking to find out what's going on in their college community, what's happening."). This link is also supported by the fact that alcohol vendors *want* to advertise in college student publications. It is counterintuitive for alcohol vendors to spend their money on advertisements in newspapers with relatively limited circulation, directed primarily at college students, if they believed that these ads would not increase demand by college students. The college newspapers fail to provide evidence to *specifically* contradict this link or to recognize the distinction between ads in mass media and those in targeted local media.

The district court, therefore, erred by finding that this link did not satisfy *Central Hudson's* third prong. Even though this link is established, we must still decide whether § 5-20-40(B)(3) satisfies *Central Hudson's* fourth prong.

D.

Under *Central Hudson's* fourth prong, commercial speech restrictions must be "narrowly drawn." *Central Hudson*, 447 U.S. at 565. The restrictions do not need to be the least restrictive means possible, but they do need to have a "reasonable fit with the government's interest — a fit 'that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Musgrave*, 553 F.3d at 305 (*quoting Greater New Orleans Broad.*, 527 U.S. at 188). Further, the state "must consider alternatives to regulating speech to achieve its ends." *Musgrave*, 553 F.3d at 305.

Where a state has a comprehensive scheme to serve its interest, limitations on commercial speech should "complement non-speech alternatives," not serve as substitutes for them. *See id.* at 306.

Here, § 5-20-40(B)(3) is narrowly tailored to serve the Board's interest of establishing a comprehensive scheme attacking the problem of underage and dangerous drinking by college students. Section 5-20-40(B)(3) is not a complete ban on alcohol advertising in college newspapers. First, it only prohibits certain types of alcohol advertisements. In fact, it allows restaurants to inform readers about the presence and type of alcohol they serve. Second, the restriction only applies to "college student publications" — campus publications targeted at students under twenty-one. It does not, on its face, affect all possible student publications on campus. Therefore, § 5-20-40(B)(3) is sufficiently narrow.

Further, the Board not only considered non-speech related mechanisms to serve its interest, it actually implemented them through education and enforcement programs. Section 5-20-40(B)(3) complements these non-speech alternatives. Within the Board's multi-pronged attack on underage and abusive drinking, § 5-20-40(B)(3) constitutes an additional prevention mechanism. Without it, either education or enforcement efforts would have to be increased, and given the Board's limited resources, § 5-20-40(B)(3) is a cost-effective prevention method that properly complements their non-speech related efforts.

The college newspapers argue that § 5-20-40(B)(3) is not the least restrictive means to serve the Board's interest because there are other, more effective ways to fight underage and abusive drinking without restricting speech. However, § 5-20-40(B)(3) does "not necessarily [need to be] the single best disposition[,] but one whose scope is in proportion to the interest served." *Musgrave*, 553 F.3d at 305 (*quoting Greater New Orleans Broad.*, 527 U.S. at 188). The Board has shown

that § 5-20-40(B)(3) is an integral, reasonable fit to serve its interests. The possible existence of more effective methods does not undermine § 5-20-40(B)(3), especially in light of its role in a comprehensive scheme to fight underage and abusive drinking. The district court, therefore, erred by finding § 5-20-40(B)(3) to be overly broad.

### E.

On its face, the Board's ban on alcoholic advertisements in college student publications passes muster under *Central Hudson*. The district court, therefore, erred in finding otherwise.

### III.

For the foregoing reasons, we reverse the district court's order granting summary judgment, vacate its permanent injunction, and remand for proceedings consistent with this opinion.

*REVERSED AND REMANDED*

MOON, District Judge, dissenting:

I respectfully dissent.

Preliminarily, I observe that the regulation, properly construed, does not apply to these newspapers. "[T]he parties agree that a majority of the readership of the college newspapers is over the age of twenty-one," *ante* at n. 1, and the undisputed statistical evidence in the record supports that agreement. More than half of the students at these universities are over the age of twenty-one, as of course are most faculty and staff. J.A. 464, 470-71, 477, 480. Given that a majority of the readership is over the age of twenty-one, these college newspapers are not "distributed or intended to be distributed primarily to persons under 21 years of age," as required to be

subject to the strictures of 3 Va. Admin. Code § 5-20-40(B)(3). This case could be resolved on that ground without reaching the broader constitutional question. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."); *see also Thompson v. Greene*, 427 F.3d 263, 267 (4th Cir. 2005) (quoting *Ashwander*). However, both the district court and the majority reach and address the constitutional question, and so I do as well.[1]

On the merits of the constitutional issue, I think we should affirm. To satisfy the requirement that the regulation "directly advances the governmental interest asserted," *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980), the government must demonstrate that

---

[1]The Board argued before the district court that "the regulation 'is no longer at issue'" because "the ABC Department has not enforced [the regulation] since the filing of the instant suit" and "the ABC Department intends to implement a committee to examine the advertising regulations." J.A. 82. The district court observed that "[t]he regulation . . . remains promulgated in the Virginia Administrative Code," and determined that "voluntary cessation of enforcement, even with the intent to reconsider the merits of the regulation," did not render the regulation moot, given that the Board "could elect to enforce [the regulation] at any time" and "any intention to repeal the regulation is, at best, speculative." *Id*. As the majority notes, "regardless of whether § 5-20-40-(B)(3) applies to these college newspapers, they have a sufficient credible fear of prosecution under this regulation." *Ante* at n. 1. Nonetheless, it is my opinion that the better approach would be to avoid the constitutional question, providing relief "'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Were we to hold that the regulation does not apply to these newspapers, the state would be barred from further attempts to enforce the regulation against them. *See, e.g., State Water Control Bd. v. Smithfield Foods, Inc.*, 261 Va. 209, 214-15 (2001) (final judgment on the merits of a claim in federal court precludes the parties from further litigation on that claim in state court).

the challenged law "alleviate[s]" the cited harms "to a material degree," *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (citation omitted); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999); *Pitt News v. Pappert*, 379 F.3d 96, 107 (3rd Cir. 2004). "This burden is not satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001); *Pitt News*, 379 F.3d at 107. It is likewise not enough if a law "provides only ineffective or remote support for the government's purposes," *Edenfield*, 507 U.S. at 770 (quoting *Central Hudson*, 447 U.S. at 564), or if there is "little chance" that the law will advance the state's goal, *Lorillard*, 533 U.S. at 566. *See also Pitt News*, 379 F.3d at 107. Meeting this burden "is critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)(quoting *Edenfield*, 507 U.S. at 771); *see also Pitt News*, 379 F.3d at 107. In sum, the burden is on the government, and the record here supports the district court's finding that the government failed to carry its burden.[2]

I am persuaded by an opinion from the Third Circuit dealing with similar facts. *Pitt News v. Pappert* (written by then-Judge Alito) invalidated a Pennsylvania statute that banned "advertisers from paying for the dissemination of 'alcoholic beverage advertising' by communications media affiliated with a university, college, or other 'educational institution.'"[3]

---

[2]The district court found the government's evidence speculative. J.A. 92-96. For example, the district court observed that the Board's expert "offers no rationale or evidence, beyond conjecture, to support his claim as to the singularity of a college publication. . . . [H]is insight ignores the common sense reality that college students now live in a multimedia environment . . . , all of which display uncensored alcoholic advertisements." J.A. 95-96.

[3]To be sure, the statute at issue in *Pitt News* did not contain the exemptions allowed by § 5-20-40(B)(3); however, as I explain *infra*, those exemptions constitute inconsistencies that, under a *Central Hudson* analysis, further undermine the legitimacy of § 5-20-40(B)(3).

379 F.3d at 101. *Pitt News* ruled that the Pennsylvania statute "founder[ed] on the third and fourth prongs of the *Central Hudson* test."[4] *Id.* at 107. Finding that the third prong of the *Central Hudson* test had not been met, the Third Circuit observed that the Commonwealth of Pennsylvania had not carried its burden of showing that the statute "had the effect of greatly reducing the quantity of alcoholic beverage ads viewed by underage and abusive drinkers on the Pitt campus. . . ." *Id.* The court found that the Pennsylvania statute applied

> only to advertising in a very narrow sector of the media (i.e., media associated with educational institutions), and the Commonwealth has not pointed to any evidence that eliminating ads in this narrow sector will do any good. Even if Pitt students do not see alcoholic beverage ads in *The Pitt News*, they will still be exposed to a torrent of beer ads on television and the radio, and they will still see alcoholic beverage ads in other publications, including the other free weekly Pittsburgh papers that are displayed on campus together with *The Pitt News*. The suggestion that the elimination of alcoholic beverage ads from *The Pitt News* and other publications connected with the University will slacken the demand for alcohol by Pitt students is counterintuitive and unsupported by any evidence that the Commonwealth has called to our attention.

*Id.*

Here, as in *Pitt News*, "the Commonwealth relies on nothing more than 'speculation' and 'conjecture.'" *Id.* at 107-08.

---

[4]*Pitt News* also found the Pennsylvania statute "presumptively unconstitutional because it targets a narrow segment of the media. . . ." 379 F.3d at 105. Having broached the constitutional issue, I would embrace also the alternative argument that the regulation unjustifiably targets a specific segment of the media.

Under the third prong of a *Central Hudson* analysis, I disagree with the finding that "the link between § 5-20-40(B)(3) and decreasing demand for alcohol by college students [is] amply supported by the record." *Ante* at 10. The evidence in the record indicates such a link is speculative, at best.[5] Nor am I persuaded by "the fact that alcohol vendors *want* to advertise in college student publications" and that alcohol vendors would not "spend their money on advertisements in" college student publications "if they believed that these ads would not increase demand by college students." *Ante* at 10. The Board's justification for the regulation is not to reduce general "demand by college students," a significant number of whom are of legal age to imbibe, but to reduce "*underage* and *abusive* drinking among college students." Appellants' Br. at 2 (emphasis added). The regulation not only impermissibly infringes upon the constitutional rights of adults (with the result of limiting the adult readership to receiving only speech

---

[5]The newspapers' expert concluded that "no evidence exists to support a substantial or material effect of a ban of alcohol advertising in college newspapers. . . . Brand advertising only affects brand sales (or vice versa), and market-wide demand for alcohol is not stimulated by advertising." J.A. 486. And, although the Board's expert reached the opposite conclusion, an examination of his published articles and his deposition testimony reveals that there is no evidence that the regulation directly and materially advances the goal of diminishing underage or abusive drinking by college students. Indeed, the Board's expert has published the statement that "[t]here is . . . very little empirical evidence that alcohol advertising has any effect on actual alcohol consumption." J.A. 310-11, 326. The Board's expert has also acknowledged that a ban on advertising in one medium generally results in greater advertising saturation in other media or forms of marketing. J.A. 343, 350.

Moreover, as the district court recognized, the regulation has been on the books, altered over time to reflect changes in the legal drinking age, since the repeal of Prohibition. J.A. 84, 93. Yet, as the Commonwealth implicitly concedes, underage and abusive drinking by college students has not diminished since the enactment of this regulation; rather, the evidence demonstrates that the problem has grown and exacerbated over time, despite the decades-old restriction. J.A. 93. This suggests to me that the regulation does not materially advance the Commonwealth's purported interest in curbing underage or excessive drinking. J.A. 93-94.

that the Commonwealth deems appropriate for persons under the age of twenty-one), it also infringes upon the rights of those readers who are not yet twenty-one, who nonetheless have a protected interest in receiving truthful, non-misleading information about a lawful product that they will soon have the legal right to consume. And of course the advertisers have the right to communicate such information.

As for the fourth prong under *Central Hudson*, I acknowledge that § 5-20-40(B)(3) contains exemptions that permit restaurants to advertise "the presence and type of alcohol they serve." *Ante* at 11. Indeed, the poor "fit" between the regulation and the Commonwealth's asserted goal is belied by what § 5-20-40(B)(3) permits. *Lorillard*, 533 U.S. at 555; *Greater New Orleans*, 527 U.S. at 188; *West Virginia Ass'n of Club Owners and Fraternal Serv. Inc. v. Musgrave*, 553 F.3d 292, 305 (4th Cir. 2009); *Pitt News*, 379 F.3d at 108. Although the regulation prohibits advertising of prices, brands of alcohol, and names of specialty drinks, it allows promotions of "beer," "wine," and "mixed beverages" to appear in the very same newspapers that are allegedly "targeted at students under twenty-one." *Ante* at 11. It is inconsistent to maintain that a regulation that permits advertisements for "beer night" or "mixed drink night" "in reference to a dining establishment" forms a reasonable fit with the goal of curbing underage or excessive drinking merely because it forbids advertisements for keg delivery, "mojito night," or the "Blacksburg Wine Festival."[6] J.A. 73, 74. Indeed, the Supreme Court has pointed to this sort of internal inconsistency in striking down advertising

---

[6]Nor does the regulation form a reasonable fit to its goal insofar as it prohibits advertisements for national brands, considering the heavy promotion of these products in other media, including print media, available to college students regardless of whether they are of legal age to drink. According to the Board, however, "the alcohol industry" restricts "advertisement of alcoholic beverages to media where at least 70% of the audience is reasonably expected to be over the age of 21." Appellants' Reply Br. at 10; J.A. 359. The Board thus contends that its regulation "is not about brand advertising," but "is about bars and grocery stores, *drink specials* and discounts, intended to attract purchasers - not to a particular brand, but to a *particular outlet or venue*, or even just off campus - to locations where alcohol will be sold." *Id.* (emphasis added). Yet the exemptions in the regulation permit a "dining establishment," *i.e.*, a "particular outlet or venue," to promote "beer night" or "mixed drink night."

regulations under the third prong of a *Central Hudson* analysis. *See Greater New Orleans*, 527 U.S. at 190 (observing that a ban on broadcasting lottery information was "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it."); *Coors Brewing*, 514 U.S. at 490 (the government's "anecdotal evidence and educated guesses" do not "overcome the irrationality of the regulatory scheme," which prohibited alcohol content information in labeling but not in advertising). An attempt to rationalize these inconsistencies, defending them on the ground that the regulation "is not a *complete* ban on alcohol advertising in college newspapers," *ante* at 11 (emphasis added), may state an accurate observation; however, the statement is wholly unresponsive to the requirements of *Central Hudson*. It fails to disguise the fact that there is no empirical support for banning one type of advertisement but not the other.

I disagree with the finding that § 5-20-40(B)(3) is "sufficiently narrow" because it applies to "campus publications targeted at students under twenty-one" and "does not, on its face, affect all possible student publications on campus." *Ante* at 11. While the latter observation may be true, the former is not. There is no evidence that these newspapers are "targeted at students under twenty-one."[7] The record reveals that the

---

[7]As I have already observed, the parties agree that a majority of the readership of the college newspapers is over the age of twenty-one, and the undisputed statistical evidence in the record supports that agreement. J.A. 464, 470-71, 477, 480. A majority of the students at these universities are over the age of twenty-one, as of course are most faculty and staff. *Id.*

Appellants argue that "[t]he intended audiences of the UVA and Va. Tech student newspapers include a relatively large population of graduate and professional students," but that, "[w]here the student population of an institution is comprised only of undergraduates, it is likely that its student newspaper's intended audience is comprised primarily of undergraduate students" who are under age twenty-one. Appellants' Br. at 23. Although in most circumstances a facial challenge to the constitutionality of a law can succeed only by establishing that there is no set of circumstances under which the law would be valid, *i.e.*, that the law is unconstitutional

majority of the readership of these newspapers is of legal age to drink. Accordingly, under the fourth step of the *Central Hudson* test, the regulation here, like the Pennsylvania statute in *Pitt News*, is not "a means narrowly tailored to achieve the desired objective," *Lorillard*, 533 U.S. at 555 (quotations omitted), given that it "is both severely over- and under-inclusive," *Pitt News*, 379 F.3d at 108 (observing that "more than 67% of Pitt students and more than 75% of the total University population is over the legal drinking age").

True, the regulation need not be "the single best disposition," but only "one whose scope is in proportion to the interest served." *Musgrave*, 553 F.3d at 305. However, a commercial speech restriction must be "'a *necessary* as opposed to merely convenient means of achieving'" the Commonwealth's interests, and "the costs and benefits associated with" the restriction must be "'carefully calculated.'" *Musgrave*, 553 F.3d at 305 (citations omitted; emphasis added). Here, the scope of § 5-20-40(B)(3), and its impact on protected commercial speech, are far out of proportion to the interest served, and the record indicates that "the Commonwealth can seek to combat underage and abusive drinking by other means that are far more direct and that do not affect the First Amendment."[8] *Pitt News*, 379 F.3d at 108. In short, the

---

in all of its applications, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-51 (2008), facial challenges "in the First Amendment context" may succeed when a "substantial number" of the law's applications are unconstitutional, *id*. at 450, n. 6 (citations omitted). Additionally, "[i]n determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id*. at 449-50 (citation omitted).

[8]For example, the Board's own expert has acknowledged the following more direct means: increased taxation on alcohol, which has been empirically verified and quantified as a means to combat underage and binge drinking ("[i]ncreased taxation is more effective than advertising bans") (J.A. 21, 319); and counter-advertising to correct students' perceptions

advertising ban here offers "only ineffective or remote sup-port," not a direct means, to combat underage and abusive drinking. *Central Hudson*, 447 U.S. at 564; *Edenfield*, 507 U.S. at 770; *Pitt News*, 379 F.3d at 107.

In my view, the regulation cannot withstand constitutional scrutiny under *Central Hudson*. It is objectionable that the Commonwealth's rationale for the regulation applies only to underage and abusive drinking, while the regulation itself applies much more broadly. In free speech cases, it is danger-ous and unwise to sustain broad regulations for narrow rea-sons. *Central Hudson* confirms this reasoning, recognizing that a regulation restricting commercial speech must be "'nar-rowly drawn.'" 447 U.S. at 565 (citation omitted). Section 5-20-40(B)(3) fails to "directly advance[ ] the governmental interest asserted" and is "more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566. I would therefore affirm the judgment below.

---

about their peers' drinking habits and provide facts as to the dangers of underage and excessive drinking ("increased counteradvertising, rather than new advertising bans, appears to be the better choice for public pol-icy") (J.A. 351). *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (plurality opinion of Stevens, J., joined by Kennedy, Souter, and Ginsburg) ("As the State's own expert conceded, higher prices can be maintained either by direct regulation or by increased taxation."); *id.* at 530 (O'Connor, J., concurring, joined by Chief Justice Rehnquist and Jus-tices Breyer and Souter) ("Rhode Island's own expert conceded that the objective of lowering consumption of alcohol by banning price advertising could be accomplished by establishing minimum prices and/or by increas-ing sales taxes on alcoholic beverages.") (internal quotation marks and citation omitted). Indeed, the Board uses the following direct means: pub-lishing "educational pamphlets on the dangers of underage and binge drinking on college campuses, targeted at both underage students and their parents"; enforcing "its regulations by carefully allocating its limited num-ber of officers to target 'big events that are likely to gather college stu-dents'"; and giving "grants to colleges and college communities to supplement these targeted efforts." *Ante* at 4-5.